I'll, at this time, call upon Mr. Wiseman to go forward for the appellant, Terrence Williams. May it please the Court, Michael Wiseman, along with Helen Marino, representing Mr. Williams. Judge Smith, I'd like to reserve five minutes for a rattle. Great. Only because it's the most staff-intensive of the three issues before the Court, I would like to start off first with the penalty and effectiveness claim. I think it's way past time, given the Supreme Court's jurisprudence over the last decade, that we can really argue about counsel's performance in this case. If by any reasonable measure, it was unreasonable performance. Well, certainly the District Court agreed with you. The Commonwealth, as you know, does not, having spent a good bit of time in the red brief, addressing that very aspect of it. Yes, and I'm happy to discuss it if the Court likes, or I could move on to prejudice. I will speak only for myself and then ask Judge Chigaris and Judge Hauser to weigh in, but I do not need to hear from you with respect to the performance problem. I do not need to hear it either. I don't need to hear it as well. Okay, very well, then I'll move on to prejudice. Two recent decisions from the United States Supreme Court, Sears v. Upton, which we recently sent to the Court in the 28J letter, and Porter v. McCollum, make two points that are highly relevant to the prejudice issue before this Court. McCollum, I'm sorry, Sears says that it is consistently explained that the Strickland Prejudice Inquiry requires a, quote, probing and fact-specific analysis. That's at 130 Supreme Court 3266. Porter at 130 Supreme Court 454 says that had counsel performed effectively, the sentencer would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability, the same type of history that was presented in this Past Conviction Relief Act. All right, but the hill you have to climb is that we have present here a deferential standard of review. You do. So why should we set about second-guessing the determination that Judge Savitt made, Judge Savitt having participated from the beginning in the trial through verdict and post-verdict motions and through the PCRA proceeding, having watched that jury through selection and through verdict? Why should we second-guess what is clearly a determination on this part that whatever counsel should have done and did not do, it wouldn't have mattered? Yes. First of all, I don't think the Court is second-guessing the question under EPA is what deference is owed to Judge Savitt's prejudice conclusions. Judge Savitt got it wrong in multiple respects. Both got it wrong factually. He made unreasonable findings based on the state court record, and he applied at least three improper prejudice analyses. If I could quickly go through that. I'd like to hear that. Factually he got it wrong? Oh, yes. Let's hear how. Sure. He said, for example, that the jury heard evidence of abuse. And what we know is that the jury heard one answer from my client's mother, Mr. Williams' mother, on cross-examination from the prosecutor where the prosecutor said, you didn't abuse your son, did you? And she said, no, I didn't, but my husband did. Well, you said a few moments ago, as a premise, that the judge made a determination that there was no evidence of abuse, and you stopped at that. You didn't say abuse of Mr. Williams, you just said abuse. It wasn't abuse of the household. It was an abuse of the household. It was an abuse of the household as we presented in post-conviction. Mr. Williams was abused by his mother and his father and his brother. Mr. Williams' sister was abused by the mother and, I should say, stepfather. So what testimony was presented at the time of trial with respect to abuse of anyone within the household? None other than the one question asked by the prosecutor on cross-examination. Well, none other than one is still some. Well, sure, but I think the court needs to measure the depth of that evidence, the quality of it. Justice Saylor, in his dissenting opinion in the Pennsylvania Supreme Court, noted that not only was it abuse evidence, such as it was, that was presented by the prosecutor, but there was no mental health background or no mental health evidence presented to explain the significance of that abuse. How else Judge Savitt got it wrong? And this is analogous to what happened in the Porter case. The Florida Supreme Court in Porter did not consider or unreasonably discounted, and that's the Supreme Court's words, the United States Supreme Court's words, the expert testimony of one Dr. D. Judge Savitt did exactly the same. We presented three mental health experts in post-conviction, and Judge Savitt did not even discuss one of those experts at all, and that would be Dr. Kessel. But Dr. Kessel's testimony was, as Judge Bailson has determined, something that actually had to have been considered by Judge Savitt for him to have reached the conclusions that he did. Do you disagree with that? I do disagree. I think that falls in the category of implicit findings. Sears speaks to that at 3265 footnote 9, where it's quoted, it says, channeling powers of telepathy, Justice Scalia asserts what the trial court actually decided in this case, and then he goes on and then concludes the quote with, but it offered no such analysis in its opinion. There's a difference between an implicit finding and simply speculation. There's absolutely no evidence from which any jurist can conclude that Judge Savitt actually considered the testimony of Dr. Kessel, and more importantly, when you look at Sears, failure to even mention that expert is not the type of probing, searching inquiry that Strickland prejudice requires in which the Supreme Court has said now on multiple occasions. This is Judge Alterson. I'm interrupting you. Most of the medical witnesses testified about 14 years after the crime. Is that not so? I haven't done the math, but yes, it was somewhat after the time. I don't dispute the... Okay. All right. Okay. Now, is it true, and I think it is, that what you have to prove that at least one juror would have found the death penalty, would have found the life imprisonment. Is that right? Yes, Your Honor, that's correct. Okay. Well, then you are faced with the terrible evidence about the home invasion of Dorfman, of which he was found guilty, and then the Dorfman murder, which occurred about the same time in which he was found guilty of third-degree murder. Now, what is there about this testimony, admittedly stale, that would convince a juror to bring back life in face of that criminal record? Yes, Your Honor, and I think that's a very pertinent question. This whole concept of the dual-edged sword, that some of the mitigating evidence would have either... Well, the bad evidence was already in, but the mitigating evidence, the Commonwealth argues, and Judge Savitz found. Judge Savitz said that some of this evidence wouldn't have been helpful because it would have shown that Mr. Williams directed his hurt onto others, and the Pennsylvania Supreme Court endorsed that. Judge Smith, you wrote in the Horne case, I'm sorry, in the Horne case, in the Thomas v. Horne case, they're all Horne cases, in the Thomas case, you rejected that very argument, and you may remember that the Brian Thomas case was particularly egregious prior conduct with all kinds of very bizarre sexual abuse of animals and people, and there you said Thomas' mental health history acts as a common thread that ties all of the evidence together. And Thomas, if I recall correctly, did not have the opening the door issue in it that is presented in the Williams case. There's no opening door here, everything came in. The jury heard all about the Dorfman episode, the jury heard... No, no, no, I'm talking about the psychiatric and psychological evidence that I don't think anybody used the opening the door term in their briefing, but in the old days, that's what we called it, that by virtue of presenting the psychiatric and or psychological evidence that was not presented here, the Commonwealth would have come back and offered the damaging material that stemmed from the early... Yeah, but the damaging material would have been bad acts. It would have been acts that they already heard about. Whatever it would have been, Mr. Wiseman, my point is that that was not Thomas. Well, fair enough, but the point remains that Sears, specifically, I was going to say, Your Honor, presaged Sears, and that Sears says the very same thing. When you've got mitigating evidence that was unexplored and unpresented, the fact that some of it may not have been helpful doesn't mean it should not have been presented. Competent counsel takes the common thread, as Your Honor said in Thomas, and wraps it all together and explains not only the capital offense, but the prior offense. Judge Ellison really hit the nail on the head with what the inquiry is and has to be. What is it here that would have been presented or could have been presented that would have caused that one juror to suddenly turn around? What was it in the nature of any or some of that evidence? I mean, that respectfully is not a hard question for me to answer. What would have been presented is a history that Terrence Williams was savagely abused by his mother, his stepfather. His mother who said the first time she was called to testify, she didn't. That's a credibility question. But that's a credibility question. I understand it's a credibility question. But the Supreme Court of Pennsylvania credited that testimony. Judge Justice Saylor. I would love to be. I'm an old prosecutor. I would love to be up in front of a juror or a defense counsel and be up in front of a jury and have that kind of diametrically opposed impeachment material to hammer away at. The mother suddenly becomes absolutely useless because she's lied one time or the other. And then how do you, under that scenario, how would one impeach the brother whose testimony was that he was savagely abused? How does one impeach the teacher, Mr. Villarreal, who said he would visit the Williams home and witness the abuse? How does one impeach the Camille report showing that Mr. Williams was psychotic 10 months before the capital trial? And how does one impeach... Let me... Dr. Camille concluded that Williams was competent to be sentenced in the third degree murder case. That's right. He said he was psychotic and suffering from paranoid delusions. And our mental health... I'm sorry. Our mental health experts whose opinions were uncontested, not to mention, I mean, they not only weren't effectively crossed on it, but there was no commonwealth experts, said that this is not something that... You don't have psychotic breaks just because you're a little bit tense in prison. You have psychotic breaks as a result of longstanding mental health problems. Dr. Kaufman testified this was the classic sign of a person suffering from post-traumatic stress disorder as a result of a savage abuse. So, you know... Again... Sorry to interrupt you again. Going back to Dr. Camille, Williams denied to his psychiatrist that he had any psychiatric history. Okay. The doctor also said that his judgment-making capacity to responses to social judgment and judgment questions indicated a tendency to respond impulsively to a stressful situation without regards for the consequence of his behavior. That's how traumatized people behave. That's what all experts said. Traumatized people act that way. All of that could have been explained if the court is questioning whether there could have been impeachment because Mr. Williams reported, as Mr. Lewis did in the Lewis case, which Judge Smith was also on. In that case, this court accepted the Pennsylvania Supreme Court's view that there was not contemporary evidence of mental illness or abuse. Here we have contemporary evidence. We have the Camille report. We have the juvenile report showing that the Williams household was abusive and impoverished. We have the Dorfman pre-sentence investigation showing the same. And we have Department of Corrections records showing that Mr. Williams was given psychiatric medication pre-trial while he was incarcerated on a prior offense related to his anxiety, his depression, his insomnia, and his other symptoms. We have many things that... With all of that counsel, going back to Dr. Camille, his opinion was that he was competent to be sentenced in the third degree murder case. Yes. And competent to be sentenced is not the same question as whether there was mental health mitigation that could have been offered. He could have been competent, and yet all of those things would still be mitigating in this case. That is true, of course. But I'm curious again, since all of us really are called upon, you as well as the judges and the inquiry, we pursue to engage in the hypothetical, the what-ifs. And had Attorney Panorama done as he should at the risk of sounding mechanical, what would have been the statutory mitigating factors that should have been invoked here under the law? Because in the end, as we all know,  And no mitigation. Not even age was found by the jury in Panorama's deficient performance, even though Mr. Williams was 18 years and four months old. But the mitigating factors are what we call... Did age go out? He argued it. He argued it in a sentence. That's what I thought. But surely there was a verdict slip. Oh, yeah. Age was on there that jury didn't find, which I think is a reflection of their overall... I would say that's a pretty strong reflection of their overall sense of the case. Well, overall sense, I was going to say, well, the case is in the eye of the beholder. I was going to say in the overall sense of Mr. Panorama's performance. He didn't do a very good job of advocating anything at that point. Four pages of summation. Let me ask you a question. I'm not trying to be glib here, but it was a long time ago, but I tried these cases. They're horrible, but I tried these cases. More than one, more than two. Doesn't it strike you as extraordinary that presented with as... wrote a kind of factor as age. This jury didn't even give him the benefit of that as a mitigating factor. That's extraordinary. There's a difference between giving the benefit of and finding. The jury's failure to find as a fact that he was young, I think is a reflection of the poor performance of counsel. Had they found that he was young and his behavior didn't make a difference, that would perhaps be more of a reflection on what they thought of Mr. Williams. Let me answer Your Honor's question. The E2 mitigating factor is that Mr. Williams suffered from a significant mental health, emotional disturbance at the time of the offense. The E3 mitigating factor is that his capacity to appreciate the criminality of his conduct and the conformance conduct of the requirement of law was substantially impaired. Our experts testified to those two mitigating factors being present. Most important, even if one doesn't think that the E2 disturbance was extreme or that the E3 substantial capacity to appreciate criminality wasn't substantially impaired but simply impaired, that all comes in under the E8 catch-all. So, you know, there was a debate and I think Judge Bailson made a point that Dr. Kaufman retracted from saying he was substantially impaired to he was just impaired. And I would say that's a small difference because the point is whether he makes the E2 or the E3 mitigating factor under the statute, it all comes in nonetheless under E8. And of course, Hitchcock, he dug our stance to that proposition as well as other cases from the Supreme Court. Mr. Wiseman, I'm sorry to interrupt you again. No, you're not interrupting. We're faced with the action of the state court and see if they met the burden. And the Supreme Court of Pennsylvania referring to this subject, we have discussed it. Appellant has not met this heavy burden. It's unclear what beneficial information concerning any mental impairment at the time of the murder would have surfaced given the evaluation statement that the defendant denied any past psychiatric history. Now that's the Supreme Court. You keep referring to the dissenting opinion. That is the majority opinion. Sure, sure. Yeah. Mentally ill people often deny that they've had mental health problems. I don't know how one could read this record and say that. Is that the test under ADEPA? Well, no. But the test is that this was not a fact finding by the Pennsylvania Supreme Court. The Pennsylvania Supreme Court credited Judge Savitz's finding that the mental health opinions, and this is important, that the mental health opinions wouldn't benefit Mr. Williams because of the negative aspects of him. He projected his hurt onto others. That's not a finding. That is a philosophical position, which is what Justice Taylor said and which I think is correct. They credited the mental health experts. The Pennsylvania Supreme Court said we believe what they say, but it wouldn't have helped in prejudice because of the double-edged sword. That's what's key here. This isn't a question of fact finding that you have to defer to, although if you did, I think you could easily say it's not based on anything in the record. What they did here was they took this finding and turned it into a legal question and said, well, this wouldn't have helped him. He couldn't have met the prejudice burden because of the double-edged nature of it. And the Supreme Court has rejected it. Judge Smith, you've rejected it. It's rejectionable. It's not the law. If Henry says it, you've said it. Sears says it, I say it. It's strictly not the law. And I don't think there's much debate about that. And I'm glad Gerardo brought up the question of the burden and the standard here. The Pennsylvania Supreme Court applied an incorrect standard. Nothing they said flowing from that should really bother this court and doesn't deserve any deference. The standard, of course, being the heavy burden and we know that the standard under Strickland is not even by a preponderance. It's a reasonable probability of a different outcome, which this court has held is less than preponderance. So they applied the wrong standard. Judge Bailson got it wrong when he compared this case to Visciati and Holland. He, you know, those were cases where shorthand references were used. This is a flat-out incorrect statement of the burden. And Judge Sava got it wrong in three respects, too, which are included in my briefing. We're, of course, well beyond the time prescribed, but this is an important case and I don't want to hinder either side. So let me ask you to wrap it up at this point. Of course, you've reserved five minutes for rebuttal. Sure. I think the key points I'd like to wrap it up on are the ones related to this question of, you know, did Judge Sava make findings? Did the Pennsylvania Supreme Court endorse those findings? And I think, you know, when one does the probing and fact-specific analysis required by Sears, what you see is that the Pennsylvania Supreme Court did not consider what Judge Sava to have done was make findings. They turned that into this idea that, you know, what he found would not have been helpful. It wasn't that Judge Sava said I don't believe the lay witnesses. It wasn't that Judge Sava said I don't believe the mental health experts. What he said was none of that would have made a difference because of the dual-edged nature of that testimony. And as I said, the Supreme Court has said that's not a proper analysis. Let me move on to the Batson claim. Quickly, please. Unless there's other questions. How do we get around, no, on Batson, I mean, how do you get around Abu Jamal? Sure. If at all. I know you reserved that. Yeah, yeah. Doesn't that Abu Jamal sort of state the law of the circuit at this point in terms of contemporaneous objections? Yeah, again, Lewis is the only case that's interpreted Abu Jamal which simply said there has to be a contemporaneous objection. Well, there was an objection here. Precisely. In fact, there were really two objections. Two objections. Which then leads to the question that I have, what more could Mr. Panarello have done at the time or under the circumstances? I suppose he could have objected with respect to each of the five examples you've given us, but there was clear signal from Judge Savitt as to where he was going. Right. And I think that what Lewis says, and I can give you three specific points in Lewis' opinion, Lewis talks about a timely objection in the singular is a prerequisite to a Batson claim. It says at footnote five at 102 that Abu Jamal did not object to the prosecutor's use of preemptory challenges at any point, that's a quote, during the voir dire. And finally, in referencing to Mr. Lewis' pro se comments during the voir dire, it said that they did not serve to put the court on notice. So there's no requirement, at least to put on the record, a note like continuing the objection? I would submit that not under the law of this circuit. Look, I think Abu Jamal is a problematic decision. I understand you're bound by it. But one of the reasons it's problematic is, you know, Batson requires a prima facie case to have an objection sustained or even to have an inquiry. When does one get a prima facie case? After there's a pattern. So am I supposed to object every time an African American is struck even if I don't think discrimination is at work? What if I think discrimination is at work after the sixth strike? Does that mean I've waived the first five? I think this idea of a contemporaneous objection requires that the trial court be put on notice. And as Judge Savitz said, in both instances, he's aware of this issue. He's following it. He kept his own notes of the race, not anything else, of the race of the venire. He knew who was struck and he knew what their race and genders were. He, you know, basically accepted or I should say he suggested to the district attorney that she wasn't using race and she said, of course not. And he said, fine, I understand that's your position. Let's move on. So certainly Judge Savitz was on notice and I think all of the underpinnings for the Abu Jamal decision are present in this case as Judge Smith has pointed out. So where does that leave us? I could certainly make an argument today that we're entitled to relief under step three of the Batson analysis that's properly before the court. But I think there's a more, there's a prerequisite to that argument and that is the prosecutor's handwritten notes. I have to tell you, I've been a lawyer for 31 years and I've never had to examine a witness who was looking at a piece of paper and I didn't get to see that piece of paper. Well, I have in all my years never been aware and I'm inviting you to provide me with the authority, if you have it, of a case that has directed that a prosecutor should turn over notes made during the course of a review. Sure. Millerell versus Dreckton refers to the prosecutor's notes. Holloway versus Horne refers to the prosecutor's notes in the Hardcastle case before the circuit. Directed under a habeas rule six? Well, they're typically not... Six weeks in a term, over notes? Were those cases voluntary in terms of the prosecutor turning over the notes? Some of them may have been voluntary. That was my next point is that this is usually not very hotly debated. Batson requires an inquiry into the prosecutor's state of mind. I cannot fathom a privilege that would protect an attorney's written notes  when state of mind is at issue. If an attorney, not that this was a fraud, but if an attorney is accused of committing a fraud and they have notes about that fraud, they can't protect those notes saying, well, that's my work product. If the subject of the operation of the lawyer's mind is what's at issue, those notes are not protected. But you had it in camera review, didn't you? I mean, isn't that sort of the next best thing? Well, it's the next best thing unless the witness is on the stand and is referring to the notes. This wasn't some review done in the abstract. May I have those notes, Your Honor? No, you may not. The witness was on the stand. She was referring to them. I mean, due process requires, any fundamental notion of due process requires that the litigants in the case get to see what the witness is looking at. Didn't she rely during her testimony considerably more on the transcript of the notes of testimony than she did on her own notes? Oh, sure. Look, these issues are hard because the witness is being asked to go back many years, and we all appreciate that. They come up with reasons. Oh, in my practice, I would have stricken a person of this particular qualification. And they look at their notes. Well, so the import of your position is that, I know you don't like this term, but that we have to second-guess the state trial judge or even disbelieve him. No. He made the in-camera determination that there was nothing problematic. You don't have to second-guess because the law is very clear here. Harris versus Nelson, which is the grandfather of habeas discovery cases, 394 U.S. or 290, says that if a habeas petitioner establishes a prima facie constitutional violation, discovery is appropriate. I established a constitutional, a prima facie constitutional violation. That's a pretty broad proposition. We're talking about prosecutors. Well, we are. But then the court has to ask, are they protected in any way? And the state of mind is at issue. And I want to make the point that the Pennsylvania Supreme Court in denying me discovery, and this is a footnote 10 of their opinion at 195 of the appendix, they apply the PCRA discovery standards, which requires exceptional circumstances. Judge Aldiser, would you like to ask a question on the issue that we've been discussing relative to Batson generally or the discovery in Juarez? Yes. I would just, two things. One, these are notes of an attorney. And second, in addition to the court examining the notes and making the decision that release of them was not necessary, the witness prepared a summary of her notes and the defendant had a copy of the summary. And I think that that is significant as well. If I could respond to those observations, Judge Aldiser, that requires me to assume that the summary comports with the actual notes, that it's an accurate summary. It also completely guts, in my view, the privilege that might attend these notes, because if I'm entitled to see the summary, why can't I see the notes? And thirdly, it requires all of us to assume, not to know, but to assume in a capital case that Judge Savitt did a proper in camera, that he looked for the kinds of things that I would have looked for. And I don't think he can make that assumption. That's why we have lawyers. My job is to... And further, you are saying you just can't trust the trial lawyer saying that this is not relevant. The trial lawyer or the trial judge? The trial judge. The trial judge. The trial judge read these notes of the district attorney and said that it was not necessary to release them. I understand. And how do you comment on that? Yes. Judge Savitt also said at the beginning of the vaccine inquiry that the claim was frivolous before he heard the evidence. You know, it's a question of my eye, my defense lawyer eye looking at these notes rather than the trial judge who may have a different perspective. And I think under these circumstances where the witness has them in her hands and is looking down at them as she testifies, a due process phone fair hearing requires I get to see them. Let me stop you right there. What... What quality do the judges of this court have to attribute to the trial judge in this case? You are to say you're speaking as a lawyer you wouldn't do that. Do we totally ignore what he... What his ruling was? Do we... You want us to ignore that? The ruling on the notes? Yes. Not ignore it, but I think, look, I'm hard pressed to come up with an answer other than the witness was looking at these documents. We have to. We have to answer that question. Yes. And I think the way you can answer it, I think the way you can answer it, Judge Alviser, is by saying when a witness on the stand is referring to a document, the lawyer who's cross-examining that witness has a right to see the notes. And that's a simple answer. Do you want to add in any case where the witness is the counsel had been the counsel of the case? Well, and state of mind is an issue like in a bachelor setting. When you get to a step three inquiry which we clearly were at where state of mind is critically important, Batson says it, Millerell says it, then, yes, you have to permit the lawyer for the claimant to see the notes particularly when the witness is referring to them. In every case. When the witness is referring. In every case. In every case. In every case. That fits those criteria. Yes, sir. Yes, sir. I understand your position. Thank you. All right. Thank you, Mr. Wiseman. We'll have you back on rebuttal. Oh, you don't want to hear about the accomplice instruction? We do, but you'll do it in rebuttal, please. Okay. Very well, sir. Well, I think we've been pretty generous with the time we've converted. So, at this point, I'll ask Mr. Goldsboro to come forward for the commonwealth. Thank you, Your Honor. If it pleases the court, I'm John Goldsboro, Assistant District Attorney representing the Commonwealth of Palis and respondents below. Your Honor,        to come forward for the commonwealth. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. There are no claims here, and we respectfully ask that this court affirm the denial of relief. Maybe we should start off with where your adversary ended. If the person is on the stand referring to notes, is there a due process right to see those notes? No, Your Honor. Irrespective of the privilege it might be claimed. Judge Savitt, as Your Honor has pointed out, conducted a full hearing on this and examined both Andrea Foulkes' summary of her notes which she was testifying from directly at that hearing as well as her full notes. And of course, he had been the trial judge I believe it was 12 years before. And he found that her summary of her notes was in fact accurate and that there was nothing more in her raw notes. That's on page 1045, right? Supplemental appendix? Yes, Your Honor. Thank you. What did she refer to? Her original notes or page 1045 when she was testifying? I'm sorry. I'm not quite sure. Your adversary says that she was relying on her original notes that the judge reviewed in camera. Now we also have page 1045. Do you know what she was actually referring to when she was testifying? Right. I believe she was referring to her summary. Of course, I wasn't there so I'm not absolutely certain. Of course, her summary was prepared from her notes and so then the question becomes is there any difference? Why did you do this? And that's why the in-camera hearing occurred. Of course, Mr. Wiseman did point it out at the time and it was an issue that came up but Judge Savitt was meticulous about all of this and as he was throughout the entire hearing, he allowed unlimited development of evidence at this hearing which was, as you know, not only about the Batson claim and the ineffectiveness claim but all of the other claims that were raised in the gargantuan, I have to say, PCRA petitions multiple petitions. So, I think it's absolutely certain that this was a full and fair hearing and it's improper of the federal defenders to argue that Judge Savitt was biased here. He was not biased. He bent over backwards. Mr. Goldberger, this is Judge Alton, sorry to interrupt you. I would like you to summarize for us how the district judge treated this issue and his opinion. Yes, Your Honor. Of course, we believe Judge Batson erred in finding a prima facie showing and in reviewing any but the one strike, the second strike as to which there was a contemporaneous objection but he was absolutely correct to uphold the state court credibility finding, a credibility-based finding that there was no discrimination. As you know, Judge Savitt, who was the trial judge at the time ruled that there was no discrimination occurring and then 12 years later after a full reconstruction hearing ruled that there was no discrimination and he deferred his ruling because, of course, this was a stale claim and ruled that there was no prima facie showing. So, but the deference applies here and Judge Batson properly found that and found that the denial of the claim was reasonable and was not an unreasonable application of Batson. So, perhaps I should mention the second strike and we were talking about, I'm sorry, the second strike was the only strike as to which there was a contemporaneous objection but there was a second mention of the issue. I don't think that can be construed as a second raising of a racial discrimination claim. The second time it was mentioned it was because Petitioner himself who was a very active participant in his own trial had instructed Mr. Panarello to be nastier to Andrea Folks, the prosecutor and Mr. Panarello put that on the record as he did with many such instructions from his client and he said, as your Honor knows, I will politely and not in a nasty fashion make objections such as I did earlier to the second strike at which time Judge Savitt being meticulous not only Sua Sponte put all of his notes as to the races of the stricken jurors and those who had been selected to serve on the record orally but also found Sua Sponte that Ms. Folks was still not discriminating in his opinion. This prosecutor used fewer challenges than she could have. 16 out of 20. Before you move off of contemporary objection, I take it your position is it was necessary to object at the end or at least at some point assert a continuing objection, right? Yes, Your Honor. I believe that that's required under Abu Jamal and I don't think there's any way that you could construe what was stated here as a continuing objection. Now, again, Judge Satter, Counselor, if we disagree with you on that issue, where are you? Well, I think then we're exactly where Judge Bailson  which is that there were five challenges as to which my opponent fully developed the claim and the issue was that there was a finding of no discrimination at step three for all five of them and the District Court invited supplemental briefing on steps two and three and we went ahead and did that and he found that there were absolutely clear record reasons for those strikes showing that there was no discrimination at work. So, I think that's where we are and I think that that leads to Judge Bailson's finding that the denial of the claim was reasonable by the State Courts. Do Your Honors have any other questions about Batson or should we move on On the accomplice instruction claim perhaps we should move there. There was no evidence at trial to support it, which is both why nobody knows why an accomplice instruction was given here. Isn't that really what this issue comes down to and that is what we have is a stray instruction on a point of law for which there is no supporting evidence. Exactly. So that the question really becomes what effect, if any, should be given to that stray instruction. Exactly. And the inquiry is whether there is any possibility whether there is a possibility that the jury could have found him guilty of first degree murder as an accomplice without finding that he had a specific intent to kill. He was tried alone too. Exactly. And he didn't contend that he was an accomplice. Two diametrically opposed theories. I wasn't there when it happened. I had nothing to do with it. I was there saying he did it. Exactly. Huge gulf between the two accounts. Right. So there's no possibility that a reasonable juror, let alone a reasonable jury, could have found that. They would have had to make up evidence. And the prosecutor at no time, am I correct, said that she was content to have the jury rest its verdict on accomplice liability simply because in distinguishing in her closing argument between direct and circumstantial evidence, she speaks about the circumstantial evidence before she speaks about the direct evidence. But that's absolutely false. She was not content to have the jury rest its verdict on accomplice liability. Does she explicitly invoke accomplice liability? No, she does not. She's simply saying the circumstantial evidence we have here is weighty and in addition you have the direct testimony of Ronald Rucker and Mark Draper who was also guilty at first. He confessed to being guilty at first. There was no argument for accomplice liability and certainly if this gray instruction could be construed as an error because there was no evidence to support it and it was absolutely harmless. There's no possibility, no substantial or injurious effect on the jury's verdict here as the district court properly found. Nobody knows why this instruction was given. It was extraneous. Unless your honors have any other questions on that, I think perhaps we should move on to the ineffectiveness claim. I see I have about 10 minutes left. Thank you. Your honors, on this claim, Judge Belson also rightly upheld Judge Stavitz's credibility based findings after the extensive PCRA hearing. Let me stop you right there if I might because the appellant makes much of the absence of explicit findings, credibility or otherwise, as to why the court did not mention it. I think it's   disagreed. He did not credit the findings of all three experts, which were very, very similar. I think the case is very similar. One can view what she said as covered by some of the specific findings he made about some of the other experts' findings. But it's also clear that he didn't need to make explicit credibility findings in order for them to be regarded as binding to the state court. This court upholds implicit credibility determinations and factual findings as well as explicit ones. It's not only Taylor v. Horne, but also the Reginald Lewis case, Weekes v. Snyder, Campbell v. Smith, and other explicit ones. Clearly, the state court has to be given the benefit of the doubt, and Judge Savitt couldn't have mentioned every single thing that was brought up. Your argument is because it was so extensive and it was discussed at the hearing that the fact that his name wasn't mentioned should be inconsequential. Absolutely. As Judge Baleson found, his conclusions are inconsistent with any other approach. Certainly, he didn't ignore this expert, Dr. Kessel. She was on the stand. He was a little bit shorter, perhaps he edited something out. That doesn't make it unreasonable, doesn't take away the presumption of correctness. Of course, we had a bevy of materials that would have made it worse for Williams, including a mental health report much closer to the time of the murder two months before the murder, is Dr. Heller's report, versus their Dr. Camille report, which was eight months after the murder, and it explicitly says that he has a condition that could have lasted for no more than six months, so it could not have existed at the time of the murder, the schizophrenic form. Which is kind of budding schizophrenia. Exactly. And I believe the expert, Dr. Camille, in the report speculates quite rightly that it could have been related to the stress of his present incarceration. It was his birthday after all. He just had a son, I'm sorry, a daughter, an infant daughter, and he had just been found guilty of one murder, and he was facing a capital murder trial coming right up, and then we have a couple of months later his prison counselor explaining that all of this newspaper coverage of him being a gay prostitute in prison meant that he was getting pressure for gay sex in prison. Of course he was feeling pressure. So the district court, I believe, correctly found that there was no prejudice given this harmful material, the sort of backfire material that we would definitely have introduced, but I think it was not finding that counsel's performance was reasonable here, simply because Mr. Panarella clearly knew that we had this material. I think he simply said, I'll just confine it to this, before the penalty phase, in the conference, he expressed concern that not too much evidence came in about the other cases and he talked about the duality of evidence. And then in the post-trial motions and hearings, he talked about the rapidity of events. He was quite general and vague in his answers because the questions that were asked of him at the time and during the  were very vague. But nonetheless, that reference shows, and his saying that he was familiar with the prior cases, shows that he knew that there was a bevy of community members who came in to testify that this guy had a loving family. That implies non-abusive. But his testimony also suggested that he believed it to have been William's responsibility to name them, muster them, and provide them to him as counsel. I do believe that it's ambiguous as to whether he was saying that he didn't know the names or he didn't know who was willing after all this time to come in and support this guy. They had definitely, and he knew, come in in the past to support this guy. Isn't it a stark fact that he only met his capital client the day before trial? Your Honor, I think that's misleading because Mr. Panarella clearly was corresponding with his client months before trial. Judge Shigaris asked about meeting with him. Meeting with him, certainly. This isn't a third degree theft count somebody's going to trial on. This is a capital homicide case. Yes, Your Honor. As I read the record, I saw nothing to suggest that Mr. Panarella ever met with his client any earlier than that. Nothing. I believe the ABA standards speak in terms of communication, Your Honor, not actual face-to-face meeting. If you were going to stand there for your life, is this good statistics? I believe that if he has attorney associates communicating with him, actually meeting with him. The proof of the pudding is that he went to trial with a client who didn't trust him and he had problems as a consequence of that. Yes, Your Honor. Any of us who have tried cases know darn well that the ABA standards do speak in terms of communication, not in terms of a face-to-face meeting. But in any event,   have to go down to come back to here is that we would have put on a ton of evidence that the ABA standards do speak in terms of evidence that would have made this mental illness and abuse approach absolutely counterproductive. My opponent says it all came in here. It would have been a bad act. I disagree completely. That's not true. We would have brought in the community member testimony in the prior cases that he came from a loving family background and was a leader from teachers and coaches and neighbors and family members. The three good prior mental health reports, including the one closest to the crime from Dr. Heller, which was, by the way, after the murder   Heller, there was absolutely no mental illness recommended that he be permitted to return to college on scholarship after this armed robbery. He did. He kept attending classes after that trial. He was let out on bail when he was arrested and after he was found guilty he was let out on bail pre-sentencing, which is how he was able to murder Amos Norwood. He finished his freshman year, as far as I know. He put on so much evidence showing his elaborate excuses to distance himself from the crimes and that dovetailed perfectly with his excuses in this case to distance himself from the crimes. In Dorfman, he was caught literally red-handed with the rouge on the bag and he said, well, I was really just literally holding the bag for the other guy and it had rouge on it. In the Hamilton case, he wrote what he called a jealousy note, I loved you, on the mirror, which pointed to Antonio, the roommate of Draper at Cheney, who he knew had lived with and loved Hamilton before Hamilton had switched over to Williams. In the Hamilton case, the portions of his in-prison notes to Draper that were redacted and did not come out in the Norwood case, none of this came out, trying to get Draper to change his story on that night, trying to cast aspersions on Draper and wanting to go and retrieve naked photos from the trunk and using Hamilton's credit card just like he did with Norwood. Even the fact that he called one girl, his girlfriend, in the Norwood case and a different one in the Hamilton case and she    the Norwood case. There were many, many points, but I think one of the most powerful ones, if I might just, I see my time is up. We will afford you additional time. In the Hamilton and Norwood cases, lying to his friends and to police and then to his experts in PCRA about being stabbed when jogging in January of 1984. He said he was mugged to explain the knife injuries he had when those marks were from his first murder victim. He later said he stabbed himself. That's correct. He made up another story. He said I was making up the story about being mugged. That's what he told one of his experts. In every case, counsel could always have done more and always could have done things differently. No second time murderer is ever happy with a death sentence. Or raises, by the way, a claim like this. This claim was first raised by Petitioner himself. It's arguable that he even raised it pre-trial as part of his pre-trial attempt. The strategy that's proposed by my opponents absolutely would have backfired. It would have been harmful. There is no reasonable probability that this would have made a difference. I think it's absolutely wrong to say that the Pennsylvania Supreme Court applied the wrong standard. It cited Strickland itself and found specifically in its language, I think we quoted this, that the PCRA court had concluded appellant hadn't met his burden of demonstrating that there was a reasonable probability that appellant would have received the life sentence. Although it did talk about in other places the heavy burden to show prejudice, in a case like this, it is a heavy burden that the courts hewed entirely cleanly to the language of Strickland. I would agree that they were a little bit vague in the way that they went about it, but I believe that they cited it and that their findings, they applied it fairly and reasonably. And there are two points    The first point is that the court did not have the assistance of excellent law clerks. Do your honors have any other questions about this? Judge Aldiser, do you have additional questions? I just wanted to make an inquiry on the Odessa issue. The district court would not consider it. What was your position? The Udera issue? Yes, I'm sorry, I misspoke. Yes, that issue. The fact that this was a stale claim being brought. A stale claim you have to prove by preponderance of evidence rather than using the traditional three-step. Yes, your honors. I don't think there's anything unreasonable about that approach. And certainly the district court decided not to apply it. Yes. I was just inquiring what was your position on that? Yes, well, of course, we believe that the ultimate denial of relief should be affirmed. And, of course, we believe that Udera should also be upheld. Do we need to reach that issue? Your honors, do not need to reach that issue. Your position is you'll take any help you can get. Exactly. Thank you. If I might just address briefly my opponent's point about not calling any mental health experts, they make this claim frequently. This is a funding stream question. At the sentencing phase. At the PCRA phase. At the PCRA phase. Yeah. The city government does not have as much money to spend to fight to uphold these death penalty cases as the federal government does. So what accounted for the footnote in your brief referring to the funding of the capital habeas unit. Yes, your honor. We are absolutely outmatched in terms of spending, in terms of numbers, and we certainly don't have the resources to hire the number of experts. So my opponents, of course, want there to be a per se rule that we have to call the same number of experts as they do. It comes down to McCullough versus Maryland. The federal government provides a lot more tax dollars to undo these cases than the city does to uphold them. It's just a matter of how much money we have to spend. Thank you, your honors. Thank you, Mr. Goldsberg and Mr. Wiseman. There's an essential dichotomy in the ineffective assistance plan that the commonwealth, I would submit, has not satisfactorily responded to. The commonwealth would have you believe that Terence Williams was a budding scholar, was an athlete, came from a loving stable home. They would have presented a ton of evidence to that effect. But how do you explain that he tried to burn bodies? How do you explain that he goes to a home with rouge covering half of his body and terrorizes an elderly couple? And how do you explain the deceit? Their own brief says he was leading a double life. We agree. He was a bright young promising athlete who came from a tortuous overwhelmingly abusive background and suffered from mental illness. This is exactly like Sears. In Sears, the trial presentation was the same closing argument by the prosecution in Sears and in Williams. In both cases, the prosecution made the argument this is a person who comes from a privileged background. And what the Supreme Court said is if counsel didn't do the investigation to uncover the abuse and the mental illness that was extant in that person's background, then prejudice is established. Prejudice is established. And so the fact that they could have presented tons of evidence or as they put it in a district court, the truth doesn't matter because we could have rebutted the truth with evidence of a stable home life, that's simply rejected by the Supreme Court in Sears. A few other points on mental illness. We presented evidence that they haven't rebutted. And I don't know what the court does with Mr. Goldsboro's comments about we can't afford to put on an expert. Maybe the answer is you can't afford the death penalty, but that's another debate. It's not a legal debate. It's not something this court ought to consider. You wanted to talk about the accomplice liability. Let me make a couple points before I get to it. One of the reasons Judge Savage's review was not adequate is that the prosecutor said she took notes using symbols. And so we're relying on Judge Savage to interpret her symbols without examination. She testified to what her asterisks meant. Some of them she did. Judge Baleson's finding, as Mr. Goldsboro puts it, is not subject to any deference. There was no federal court hearing. Judge Baleson erred in analyzing our discovery request under 2254D1. He said there was nothing contrary to or unreasonable about denying us discovery. Of course, 2254D1 only applies to claims to relief. It doesn't apply to discovery. The discovery standards are in the rules, they're in Bracey v. Gramley, and they're in Harris v. Nelson. And under those authorities, we get discovery if there's good cause, there's good cause established if we've established a crime of facia case, which we have. And one more comment before I get back to accomplice. Look at page 198, and this is again on the ineffective assistance of penalty phase claim, because I feel like I was talking with marbles in my mouth before, and I want this point to be clear. If you look at page 198 of the appendix, it's the Pennsylvania Supreme Court's decision or comments on the expert testimony. What they say is the PCRA court weighing this expert testimony in the context of the case, and the entire proceeding along with the record before it concluded it was outweighed by testimony from the same experts that appellant directed his heard on to other people. That's a sort of adoption of what judge Smith and Thomas said. It's been rejected by other authorities. Let me get to the accomplished point. I'm sorry. I have scattered notes. Appendix page 3904, 05, 3951 through 56, 3964, 3972, 7375 through 777 are all the same. I think the point I want to make on the accomplished instruction is that I understand Mr. Williams did not admit some participation. However, a reasonable juror looking at his testimony could have concluded he was culpable. He had proceeds of the robbery. I can just imagine what your position as defense counsel would be if the evidence was sufficient. I would say it was the first reasonable thing he said today. Seriously. The test here is was there evidence before the jury  Mr. Williams was culpable of the robbery and not the murder. Having acknowledged he was aware that the victim was duped into the car, all those types of things that we cite in our brief in the argument section could have led a reasonable decision  this case. I would submit respectfully it is not a material difference. The point is when you have two people pointing the finger the jury has to decide who is telling the truth here. I appreciate the disparity of resources. What we all know is that both sides have done an exemplary job in this matter both in briefing and in their presentations here today. We all know how difficult these cases are. I referred earlier to my own prior experience with these cases and that certainly informs my view as to their difficulty at this stage as well. Not only because of the age of matters like this but mostly because of the subject matter. Capital habeas cases are extraordinary and very difficult. We thank both sides for their exemplary advocacy here. The panel would ask that counsel confer and cooperate please with respect to having a transcript prepared of these proceedings that we will then have recourse to as we take the matter under advisement. Judge Aldisert, may I assume that you remain at the opportunity to confer on this case after we are adjourned? Absolutely. Very good. Thank you. Thank you, counsel.       to adjourn the proceedings. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.     Thank you.